UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JEREMY LEE JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:23-cv-00570-JPH-MJD |
| | ) |
| TRICIA PRETORIUS Warden, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER SCREENING FIRST AMENDED COMPLAINT
AND DIRECTING FURTHER PROCEEDINGS**

After the Court screened Plaintiff Jeremy Lee Johnson's original complaint, dkt. 15, he filed a motion to amend the complaint, dkt. 55. That motion is **GRANTED** and the amended complaint is now the operative complaint in this action. Because Mr. Johnson is a "prisoner," this Court has an obligation to screen the amended complaint before service on the defendants. 28 U.S.C. § 1915A(a), (c).

**I. Screening Standard**

When screening a complaint, the Court must dismiss any portion that is frivolous or malicious, fails to state a claim for relief, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). To determine whether the complaint states a claim, the Court applies the same standard as when addressing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Schillinger v. Kiley*, 954 F.3d 990, 993 (7th Cir. 2020). Under that standard, a complaint must include "enough facts to state a claim to

1

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court construes *pro se* complaints liberally and holds them to a "less stringent standard than formal pleadings drafted by lawyers." *Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017).

## II. The Amended Complaint

Much of Mr. Johnson's amended complaint is virtually identical to his original complaint, with a few key differences. His amended complaint names as defendants: (1) the Indiana Department of Correction ("IDOC"); (2) Centurion Health Services, the private company that contracts with IDOC to provide health care services to inmates; (3) Tricia Pretorius, the former warden of Plainfield and current warden of Putnamville; (4) Sarah Snowden, Health Services Administrator ("HSA") at Putnamville; (5) Heather Russell, ADA Coordinator at Putnamville; (6) Dr. Pablo Perez; (7) Donna Bumgardner; (8) Nurse Practitioner Jones; (9) Nurse Practitioner Elizabeth Hale; (10) Addictions Recovery Services ("ARS") Coordinator Pridemore; (11) ARS Coordinator Rothrock; (12) Tim Phegley, deputy warden at Putnamville; (13) Eric Fields; (14) Nurse Laura Nicoson; and (15) Nurse Pamela Moore.[1]

---

[1] Plaintiff does not attempt to re-name as defendants Robert Duprey, Stephanie Dorothey, Dr. Stephanie Riley, former Putnamville Warden Dushan Zatecky, or Putnamville Deputy Warden Mike Raines, whom the Court concluded in its original screening order Plaintiff had failed to state claims against. Dkt. 15, p. 17.

### A. Background

Mr. Johnson has suffered from opioid use disorder ("OUD") since 1997. He was diagnosed with and treated for severe OUD for a current addiction to heroin by a doctor in Seattle. That doctor tried treating him with Naltrexone and Vivitrol, but those treatments failed. His OUD was only successfully treated and put into remission by suboxone therapy as prescribed by the doctor in Seattle.

### B. Events at Plainfield Correctional Facility ("Plainfield")

Mr. Johnson began serving an eleven-year sentence in the IDOC in October 2022. In early December 2022, Mr. Johnson signed a "Release of Information" form so that NP Elizabeth Hale could request medical records from his doctor in Seattle. When Mr. Johnson's medical records were requested, no records from any addiction recovery services were requested.

About two months later, Mr. Johnson saw NP Jones, who knew by looking at Mr. Johnson's electronic medical records that treatment with Naltrexone and Vivitrol had previously been unsuccessful. NP Jones stated that he would order Mr. Johnson suboxone because, as of January 1, 2023, he could now prescribe suboxone. Mr. Johnson never received suboxone, so about a month later, he sent a health care request form to NP Jones about the issue. NP Jones responded by saying, "ARS Program Manager contacted." Dkt. 2 at 8.

Another month or so passed, and ARS Coordinator Rothrock came to see Mr. Johnson and had him fill out a written assessment. Mr. Rothrock stated, "You know what? I'm going to help you." *Id.* Mr. Johnson did not receive any treatment for his OUD.

3

### C. Delay in Receiving OUD Treatment at Putnamville

About a month after the visit with Mr. Rothrock, Mr. Johnson was transferred to Putnamville. In May 2023, Mr. Johnson sent a written "Request for Interview" to case worker manager Eric Fields asking about the status of his OUD treatment now that he had been transferred. Mr. Fields told him to request an ARS referral.

Mr. Johnson sent Mr. Fields another "Request for Interview" about 10 days later. Mr. Fields responded, "Write mental health about this. Or is it a part of RWI?" *Id.* at 10. Mr. Johnson contends that Mr. Fields failed to give him proper direction as to how to address his medical needs.

In mid-June, Mr. Johnson submitted a health care request form complaining about being "bounced around" in terms of how to resolve the issue of treatment for his OUD. ARS Coordinator Pridemore is the person in charge of addiction recovery and had the ability to refer Mr. Johnson to the medication assisted therapy ("MAT") program. No new referral was needed after Mr. Johnson's transfer to Putnamville. Mr. Pridemore could have easily consulted electronic records to see that a referral had already been initiated for Mr. Johnson, but he did not. As a result, Mr. Johnson was denied access to addiction recovery programs that other inmates with OUD were able to access.

### D. Naltrexone Treatment

Mr. Johnson eventually asked his counselor to refer him for MAT, and he received a referral on or about August 27, 2023. Two days later, Nurse Laura Nicoson called him to the health care unit to do a "Naltrexone Challenge." His

4

vitals were taken, and a urine screen was done, which was negative for opioids or other illicit substances. As part of the challenge, he received a half-dose of Naltrexone, and he was monitored for allergic reactions or adverse effects. About 30 minutes into the challenge, his vitals were taken, and his blood pressure was elevated. Nurse Nicoson notified Dr. Perez, Health Services Administrator Sarah Snowden, and a nursing supervisor. His vitals were taken again, and his blood pressure was still elevated. Dr. Perez ordered two doses of Clonidine, which did not reduce his blood pressure. Dr. Perez then ordered a dose of Lisinopril, which also did not reduce his blood pressure. Ms. Snowden told Mr. Johnson that he did not fail the challenge but that it was just being "paused." He was ordered to go to his dorm and lie down on his bunk rather than remaining in the health care unit even though he had blood pressure readings he characterizes as being of "obvious stroke level." *Id.* at 13.

About a week later, Mr. Johnson was again called to the health care unit to do another "Naltrexone Challenge." His blood pressure was slightly elevated during the challenge, but he successfully completed it. Dr. Perez ordered an EKG, which showed sinus bradycardia, which is a slow heartbeat. Mr. Johnson alleges that his high blood pressure coupled with the sinus bradycardia is evidence of continued adverse side effects associated with having received Naltrexone. Mr. Johnson began to be treated with Naltrexone after the second challenge.

After receiving Naltrexone, Mr. Johnson began having severe migraines, intense stomach cramps, insomnia, and suicidal thoughts. About two weeks

5

after the first Naltrexone Challenge, Mr. Johnson submitted a health care request form about these side effects. Nurse Pamela Moore told him the effects were typical and should improve in about two weeks. Two days later, Mr. Johnson submitted another health care request form about his elevated blood pressure and the other serious side effects. He was told that he had the right to refuse medication. Another week passed, and he submitted another health care request form about the side effects. He was seen by a nurse who determined that he evidenced side effects from Naltrexone and referred him to Nurse Moore for medication re-evaluation.

Around the same time, Mr. Johnson submitted two more health care request forms to Nurse Moore about the unbearable side effects of Naltrexone. He was told that his only recourse was to refuse the Naltrexone and participation in the MAT. Nurse Moore would not give him suboxone even though other inmates are provided with suboxone and it is a formulary medication that Centurion uses at all IDOC facilities.

In early October, Mr. Johnson was called to the health care unit for an evaluation of his treatment with Naltrexone. Dr. Perez prescribed Amlodipine to counteract the side effect of high blood pressure and Pepcid AC for the associated stomach cramps. Dr. Perez advised that he would see Mr. Johnson again in three or four weeks. Mr. Johnson alleges that Dr. Perez was scheduled to have major surgery and knew he would not be able to see Mr. Johnson again in that time frame. Other inmates have been provided with suboxone after they suffer adverse effects from Naltrexone. Mr. Johnson alleges that Dr. Perez should have put him

on suboxone rather than giving him two new medications and continuing him on Naltrexone, which he knew was ineffective.

About two weeks later, Mr. Johnson submitted another health care request form complaining about worsening side effects from Naltrexone but was told that he would be seen in three months. Over the course of the next several weeks, Mr. Johnson submitted three more health care request forms. One was returned to him unsigned. In response to the other two, Ms. Snowden told him that he would simply have to suffer the side effects of Naltrexone and refused to authorize suboxone for him, even though other inmates receive it. She also told him that, if he wanted to stop experiencing the side effects, he should stop using illicit substances while taking Naltrexone. Mr. Johnson alleges that he cannot simply stop taking illicit substances because of his OUD.

During his time at Putnamville, Mr. Johnson wrote to Warden Pretorius, Deputy Warden Phegley, Ms. Bumgardner, and Ms. Russell complaining that no one was responding to his grievances about medical issues, but he never received substantive responses.

Mr. Johnson alleges that Centurion has policies and customs that prioritize profit, thereby contributing to his failure to receive adequate medical care. He also alleges that Centurion is a recipient of federal funding.

Mr. Johnson also alleges that since the original filing of this lawsuit in December 2023, any and all treatment for his OUD has stopped completely and that requests for assistance from Warden Pretorius and/or Ms. Russell go unanswered.

### III. Discussion of Claims

The Court does not believe it is necessary to restate in full its analysis from the original screening order at docket 15, with respect to the status of claims that are completely unchanged by the amended complaint. The following claims **shall proceed** under that order: (1) individual capacity Eighth Amendment claims for damages against NP Hale, NP Jones, Mr. Rothrock, Mr. Fields, Mr. Pridemore, Nurse Nicoson, Dr. Perez, Ms. Snowden, Nurse Moore, Warden Pretorius, Deputy Warden Phegley, Ms. Russell, and Ms. Bumgardner based on allegations that they were deliberately indifferent to Mr. Johnson's serious medical needs; (2) Eighth Amendment damages claims against Centurion based on the denial of constitutionally adequate medical treatment; (3) Eighth Amendment injunctive relief claims seeking provision of suboxone against Warden Pretorius in her official capacity and against Centurion; and (4) Rehabilitation Act claims against the IDOC.

Additionally, the Court noted in its original screening order that Mr. Johnson's claims against Centurion under the Rehabilitation Act, 29 U.S.C. §§ 794-94e, could not proceed because there was no allegation that Centurion received federal funding. Mr. Johnson now expressly makes that allegation. Dkt. 55-1, pp. 11, 17. The elements of a Rehabilitation Act claim are that "(1) [a plaintiff] is a qualified person (2) with a disability and (3) the [defendant] denied him access to a program or activity because of his disability", and the defendant is a recipient of federal funding. *Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 672-72 (7th Cir. 2012). Construing Mr. Johnson's amended complaint liberally, he

8

has adequately alleged that Centurion violated the Rehabilitation Act and this claim now **shall proceed**. Recovery under the Americans with Disabilities Act and the Rehabilitation Act are "coextensive," and a plaintiff "can have but one recovery." *Jaros*, 684 F.3d at 673. Because the Court allows Mr. Johnson's Rehabilitation Act claims to proceed, his ADA claims against Centurion are **dismissed**.

Finally, the Court notes Mr. Johnson's new allegations that since the filing of this lawsuit, all treatment for his OUD has stopped completely and Warden Pretorius and Ms. Russell have ignored requests for assistance. Mr. Johnson asserts that this evidence of retaliation against him for having filed this lawsuit. Again, construing the amended complaint liberally, the Court concludes that Mr. Johnson has now stated an adequate First Amendment retaliation claim against Warden Pretorius and Ms. Russell, and those claims **shall proceed**.

## IV. Conclusion and Further Proceedings

The **clerk is directed** to docket Mr. Johnson's filing at dkt. [55-1] as a separate document titled "Amended Complaint."

All Defendants against whom claims are proceeding have previously appeared in this action and answered the original complaint as screened by the Court. Pursuant to Fed. R. Civ. P. 15(a)(3), all Defendants shall have **14 days from service of this Order** to file an amended answer or other responsive pleading to the amended complaint as screened by this Order.

The Court further orders that the current deadline of May 24, 2024, for filing a dispositive motion based on failure to exhaust administrative remedies is

**vacated**. A new deadline for any such motion shall be ordered, if warranted, after Defendants file responsive pleadings to the amended complaint.

Finally, the Court notes that Mr. Johnson has filed numerous "declarations" by various persons, which the Defendants have moved to strike. That motion, dkt. [80], is **granted**. The **clerk is directed** to strike the filings at dockets 56, 57, 58, 59, 60, 61, 62, 66, 67, 71, 72, 73, 74, 75, 76, 77, and 78. There is no need for Mr. Johnson to file any evidence in support of his claims at this point in the proceedings. Such evidence may be filed in support of or in opposition to a dispositive motion if filed by Mr. Johnson or any Defendant.

**SO ORDERED.**

Date: 5/20/2024

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

JEREMY LEE JOHNSON
114749
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only