UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JEREMY LEE JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00570-JPH-MJD |
| | ) | |
| TRICIA PRETORIUS, | ) | |
| SARAH SNOWDEN, | ) | |
| HEATHER RUSSELL, | ) | |
| PAOBLO PEREZ, | ) | |
| DONNA BUMGARDNER, | ) | |
| JONES, | ) | |
| ELIZABETH HALE, | ) | |
| PRIDEMORE, | ) | |
| ROTHROCK, | ) | |
| CENTURION HEALTH SERVICES, | ) | |
| TIM PHEGLEY, | ) | |
| JOSHUA FIELDS, | ) | |
| INDIANA DEPT. OF CORRECTIONS, | ) | |
| LAURA NICOSON, | ) | |
| PAMELA MOORE, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT, RULING ON
RELATED MOTIONS, AND DIRECTING FURTHER ACTION**

Plaintiff Jeremy Lee Johnson alleges violations of the Eighth Amendment

and the Rehabilitation Act based on Defendants' failure to treat his opioid-use

disorder ("OUD") while he was incarcerated at Plainfield Correctional Facility

("Plainfield") and Putnamville Correctional Facility ("Putnamville").[1] The Medical

Defendants (Defendants Hale, Jones, Moore, Nicoson, Perez, Pridemore,

---

[1] Mr. Johnson also brings First Amendment retaliation claims against Defendants
Pretorius and Russell, but they do not move for summary judgment as to those claims,
and the Court does not discuss them further. *See* dkt. 135 at 11.

Rothrock, Snowden, and Centurion Health Services) move for summary judgment on all claims against them, arguing that Mr. Johnson failed to exhaust his available administrative remedies as required by the Prison Litigation Reform Act ("PLRA") before filing this lawsuit. Dkt. 111. The State Defendants (Defendants Bumgardner, Fields, Phegley, Pretorius, Russell, and Indiana Department of Correction) also move for summary judgment on exhaustion grounds. Dkt. 115. For the reasons stated below, the summary judgment motions are **denied.** Mr. Johnson has also filed some related motions and an objection to an Order signed by the presiding Magistrate Judge that the Court resolves in this Order. Dkts. 119, 133, 136, 138.

# I.
## Objection to Magistrate Judge's Order

As discussed in more detail in Section II below, after Defendants filed their summary judgment motions, Mr. Johnson filed a motion to strike Defendants' exhaustion defenses. Dkt. 119. The State Defendants timely responded to the motion to strike. Dkt. 120. The Medical Defendants missed the response deadline by one day and moved for leave to file a belated response, attaching a copy of their proposed response brief. Dkt. 121. They explained that they thought that Mr. Johnson's motion to strike did not require a stand-alone response because they had already stated their position as to their exhaustion defense in their summary judgment motion but sought to submit a response brief to the extent that further clarification was required. *Id.* Seven days later (which was

seven days shy of Mr. Johnson's deadline to respond to the motion under Local Rule 7-1), the presiding Magistrate Judge granted their motion. Dkt. 123.

Mr. Johnson objects to the Magistrate Judge's Order, arguing that he should have been given time to respond and that the Medical Defendants did not state excusable neglect for missing the original deadline. Dkt. 133. When he filed his objection, Mr. Johnson also filed his proposed response to the Medical Defendants' motion, in which he more fully elaborates on his argument that they had not stated excusable neglect for the belated extension under Federal Rule of Civil Procedure 6(b)(2). Dkt. 132.

Rule 72 allows parties to object to a magistrate judge's ruling. *See also* 28 U.S.C. 636(b). When the objection is to a ruling on "a pretrial matter not dispositive of a party's claim or defense," the district judge will "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

Upon review, no part of the Magistrate Judge's Order was clearly erroneous or contrary to law. The Magistrate Judge was not required to wait for a response before ruling on the Medical Defendants' routine motion for leave to file a belated response. *See* S.D. Ind. Local Rule 7-1(d) (court may rule upon a routine motion before the response deadline passes unless the motion indicates that the opposing party objects or the court otherwise believes that a response will be filed). And the Magistrate Judge did not clearly err in finding excusable neglect in the circumstances presented by the Medical Defendants' motion, particularly given the timing and content of Mr. Johnson's motion to strike and the lack of

any discernible prejudice to Mr. Johnson associated with the one-day extension requested. *See* Fed. R. Civ. P. 6(b)(2) (court may extend deadline after it has expired upon showing of excusable neglect); *Bowman v. Korte*, 962 F.3d 995, 998 (7th Cir. 2020) (to find "excusable neglect," courts should "consider all relevant circumstances surrounding the party's neglect, including the prejudice to the non-movant, length of delay, and reason for delay").

Accordingly, Mr. Johnson's objection to the Magistrate Judge's Order is **overruled**.

## II.
## Motion to Strike

After Defendants had filed their summary judgment motions, Mr. Johnson filed a motion to strike their exhaustion defenses, arguing that information he received in discovery showed that the defenses were not asserted in good faith and that the Indiana Department of Correction's ("IDOC") grievance process is effectively a "dead end" such that he did not need to follow its steps. Dkt. 119. After Defendants responded in opposition, Mr. Johnson filed a reply clarifying that, even though his motion to strike was filed after Defendants filed their summary judgment motions, he tried to send it to the Court before those motions were filed. Dkt. 122. He also argued that the exhaustion defenses, as set forth in Defendants' answers, were boilerplate and should be stricken because they included no direct or inferential allegations as to the elements of the exhaustion

defense. *Id.* Later, he filed responses to the summary judgment motions. Dkts. 125–131.

A court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Generally, motions to strike are disfavored because they "potentially serve only to delay" the proceedings. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). But motions to strike may be appropriate when they expedite matters by "remov[ing] unnecessary clutter from the case." *Id.* A court may thus strike defenses that are "insufficient on the face of the pleadings," that "fail as a matter of law," or that are "legally insufficient." *Id.* District courts have considerable discretion in ruling on motions to strike. *See Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

The Court declines to strike Defendants' exhaustion defenses. The Court accepts that Mr. Johnson tried to file his motion to strike before the summary judgment motions were filed and that he was not trying to delay the proceedings by filing it. But the fact is that the motion to strike was not filed until after the summary judgment motions had been filed. By that point, Mr. Johnson had notice of the basis of Defendants' exhaustion defenses, and striking those defenses would only serve to delay the proceedings because Defendants could simply move to amend their answers to address Mr. Johnson's argument that they should have pled more facts to support their affirmative defenses.[2] The

---

[2] Given its resolution of this motion, the Court need not rule on Mr. Johnson's contention that Defendants' exhaustion defenses as pled in their answers were too barebones to be sufficient.

remainder of his arguments go to whether Defendants have a sufficient factual basis to support their exhaustion defenses. The parties' competing arguments about exhaustion are better resolved in connection with the pending summary judgment motions. And, as discussed below, there are questions of material fact that preclude final resolution of the exhaustion issue at this time.

Accordingly, the motion to strike, dkt. [119], is **denied**. *Cf. Winston v. Clarke*, 746 F. App'x 561, 564 (7th Cir. 2018) (rejecting the plaintiff's argument that the court should "strike" the defendants' exhaustion defense because they failed to carry their evidentiary burden at summary judgment, finding that the court could not rule decisively rule for either party as to the exhaustion issue because an issue of material fact remained, which would be resolved at a *Pavey* hearing). The Court will, however, consider the arguments Mr. Johnson made in his motion to strike and reply, dkts. 119, 122, when it rules on the pending summary judgment motions.

### III.
### Motion for Leave to File Surreply

Mr. Johnson's unopposed motion to file a surreply on the issue of exhaustion, dkt. [136], is **granted**. The **clerk is directed** to docket his proposed surreply, dkt. [136-1], as a separate document.

### IV.
### Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ.

P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

# V.
# Factual Background

Mr. Johnson's claims span time periods when he was incarcerated at Plainfield and Putnamville, both of which are prisons within the Indiana Department of Correction ("IDOC").

## A. Grievance Process[3]

The IDOC has a standardized grievance process that was in place during the time Mr. Johnson alleges his rights were violated. Dkt. 116-1 at 2. The grievance process consists of three steps: (1) submitting a formal grievance following unsuccessful attempts at informal resolutions; (2) submitting a written appeal to the facility Warden/designee; and (3) submitting a written appeal to the IDOC Grievance Manager. Dkt. 116-2 at 3. Successful exhaustion of the grievance process requires timely completion of each step. Dkt. 116-1 at 3.

As to the first step, an inmate must file a grievance by submitting a completed State Form 45471 to the prison Grievance Specialist no later than 10 business days from the date of the incident giving rise to the complaint or concern. Dkt. 116-2 at 9. The Grievance Specialist then has 10 business days to accept and record the grievance or to reject it. *Id.* at 9–10. If an inmate does not receive either a receipt for an accepted grievance or a rejected form from the Grievance Specialist within 10 business days of submitting the grievance, the inmate must "notify the Offender Grievance Specialist of that fact (retaining a

---

[3] Both the Medical Defendants and the State Defendants submitted similar evidence setting forth the contents of the grievance process. For simplicity's sake, the Court cites only to the State Defendants' evidence.

copy of the notice) and the Offender Grievance Specialist shall investigate the matter and respond to the offender's notification within ten (10) business days." *Id.* at 9.

The section of the grievance policy titled "Screening the Grievance" sets forth the procedure for rejecting a grievance without recording it. *Id.* at 10. Under that section, if the Grievance Specialist decides to reject the grievance, he or she must use State Form 45475, "Return of Grievance," to communicate that decision to the inmate. *Id.* at 10. The inmate then has 5 business days to make the necessary revisions to the grievance form and return the revised form to the Grievance Specialist. *Id.*

The section of the grievance policy titled "Response to Grievance" governs the steps the grievance specialist takes when a grievance is accepted and recorded. *Id.* at 10–11. If the grievance is accepted, the Grievance Specialist has 15 business days to investigate the grievance and provide a response, although that time can be extended on notice to the inmate. *Id.* at 10–12. The "Response to Grievance" section concludes by stating, "If the offender receives no grievance response within twenty (20) business days of the Offender Grievance Specialist's receipt of the grievance, the offender may appeal as though the grievance had been denied." *Id.* at 12. That said, if there is a delay in investigating the grievance, the Grievance Specialist may seek approval for a time extension from the Warden/designee. *Id.* at 12. The Grievance Specialist must notify the inmate in writing of the number of days of the extension. *Id.* "In this event, the time to

appeal begins on the twenty-first (21st) business day after the grievance was recorded or at the end of extension approved by the Warden/designee." *Id.*

Once the Grievance Specialist provides a grievance response to the inmate for an accepted and recorded grievance, he has 5 business days to file a first-level appeal by submitting State Form 45473, "Grievance Appeal." *Id.* at 12. Although the policy does not explicitly so state that any additional steps are required to submit an appeal, Mr. Johnson has submitted a declaration under penalty of perjury stating that, in practice, to get a State Form 45473 from the grievance specialist, the inmate must first check a box marked "Disagree" on the grievance response form. Dkt. 116-5 at 4; dkt. 126-1 at 1–2.[4]

Once a first-level appeal is submitted, the Warden/designee has 10 business days to respond, although that period may be extended upon notice to the inmate. Dkt. 116-2 at 13–14. If the inmate is dissatisfied with the response, he has 5 business days to file a second-level appeal by checking the "Disagree" box on the response and submitting a completed State Form 45473. *Id.* at 13.

---

[4] The State Defendants contend that the Court should not consider Mr. Johnson's statements about this "unofficial" step of the grievance process because they are unsupported by any citation to the record and their witness did not testify to the existence of such a step in her summary-judgment declaration. Dkt. 135 at 9. But the statements *are* supported by a record citation, namely a citation to a document submitted with the State Defendants' summary judgment motion—a grievance response form that states that the response may be appealed and then directs the inmate to check "Agree" or "Disagree" on the response and then sign and date the form. Dkt. 116-5 at 4. The State Defendants never explicitly deny that this unofficial step exists, but to the extent that they do, this evidence is sufficient to create a genuine issue of material fact as to whether inmates must check the "Disagree" box to get an appeal form. The record also includes other admissible evidence on this point, including Mr. Johnson's declaration under penalty of perjury. Dkt. 126-1 at 1–2. A party's "self-serving" sworn testimony need not be corroborated to be considered on summary judgment. *See Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020).

He may also file a second-level appeal if he does not receive a timely response to his first-level appeal. *Id.* Once the second-level appeal is filed, the Department Offender Grievance Manager has 10 business days to respond, although that period may be extended. *Id.* at 14.

### B. Mr. Johnson's Grievances

Mr. Johnson's claims relate both to time he spent at Plainfield and time he spent at Putnamville, so the Court discusses the two separately.

#### 1. Plainfield

Mr. Johnson filed one relevant grievance while he was incarcerated at Plainfield. In a grievance dated March 2, 2023, and assigned grievance number 23-152508, he complained that he was on a Medication Assisted Treatment ("MAT") program for opioid-use disorder and was receiving suboxone before he was arrested but, when he came into IDOC custody, that program was not continued, and he was left to withdraw, leaving him "physically and emotionally . . . not right." Dkt. 116-4 at 2. He asked to be placed back on the MAT and suboxone. *Id.* Grievance specialist Kyle Foster recorded the grievance on March 13 and responded on April 4, stating:

> After reviewing your grievance and speaking with Ms. Sloan—I saw this individual on 3-16 and clarified the policy for him. I informed patient that he was not able to complete traditional programming due to his housing restrictions. However we do offer foundations which is a self-study program and I would refer him for MAT. Patient verbalized an understanding of this and appeared to be satisfied with the response.

11

*Id.* at 1. Mr. Johnson acknowledged receiving the response on April 8, 2023, and checked the "Agree" box on the response form. *Id.* No party has submitted evidence showing that Mr. Johnson tried to appeal this response.

According to Mr. Johnson, the promised referral to MAT did not happen, and he was soon transferred to Putnamville, where he had to get a new referral. Dkt. 126-1 at 2.[5] It is not entirely clear when Mr. Johnson transferred to Putnamville, but the transfer had certainly occurred by May 17, 2023. *See* dkt. 99 at 5 (verified amended complaint alleging that Mr. Johnson submitted a request for interview at Putnamville on May 17, 2023).

### 2. Putnamville

#### a. June 19, 2023, Grievance

After his transfer to Putnamville, Mr. Johnson filed multiple Health Care Request Forms in an attempt to get a new MAT referral. Dkt. 126-1 at 2. He was told to contact his case manager. *Id.* As a result, on May 17, 2023, he sent a "Request for Interview" to Defendant Fields asking for a referral. Dkt. 55-1 at 5. He sent another request for interview form to Mr. Fields on May 27, 2023. *Id.* He then completed and submitted a grievance on June 19, 2023. Dkt. 55-2 at 2; dkt. 126-1 at 2.[6] In the grievance, he complained that he had been denied

---

[5] Mr. Johnson submitted the same evidence in support of his responses to the two summary judgment motions filed by the two sets of Defendants. Dkts. 126-1, 131-2. The Court cites to the first copy of the evidence in the record, that at dkt. 126-1.

[6] The IDOC has no record of this grievance, dkt. 116-1 at 10, but Mr. Johnson states under penalty of perjury that he submitted it, dkt. 126-1 at 2, so the Court accepts that statement as true for purposes of summary judgment.

suboxone and the MAT program for several months and asked to be placed on suboxone therapy again. Dkt. 55-2 at 2.

A month passed with no acknowledgement of the grievance, so he wrote to Defendant Warden Pretorius. Dkt. 55-2 at 6; dkt. 126-1 at 2. Defendant Russell responded on August 2, 2023, saying that she talked to Defendant Bumgardner, who advised that the grievance would be filed and Mr. Johnson would be "receiving a response promptly." Dkt. 55-2 at 6; dkt. 126-1 at 2.

### b. Attempt to File Grievance on September 28, 2023

Mr. Johnson filed another grievance on September 28, 2023. Dkt. 55-2 at 7; dkt. 126-1 at 2. In that grievance, he complained that he had been prescribed Naltrexone for his OUD even though medical staff knew it caused severe side effects, medical staff did not treat him when he complained about the side effects, and medical staff told him that his only option was to refuse Naltrexone and withdraw from the MAT. Dkt. 55-2 at 7. He asked to be given a treatment other than Naltrexone. *Id.*

That grievance also went unacknowledged for more than a month. Dkt. 126-1 at 2. On November 6, 2023, Mr. Johnson wrote to Warden Pretorius, complaining that his grievances had gone unanswered since June. Dkt. 55-2 at 8; dkt. 126-1 at 3.  Two days later, Warden Pretorius responded, stating, "There is no question to respond to here . . . . Grievances are behind but will be responded to." Dkt. 55-2 at 8.

Mr. Johnson sent Warden Pretorius another letter in November 2023 and again complained about not being given suboxone. Dkt. 69-1 at 7. Warden

Pretorius responded on November 21, 2023, stating, "I am not a qualified medical provider nor can I dictate medical treatment . . . . You may file a grievance on this matter. Yes, we are behind, but you will receive a documented response." *Id.*

### c. Filing of Complaint

Mr. Johnson filed his original complaint in this case on December 15, 2023. Dkt. 2.

### d. Grievance Number 24-169446, Submitted December 23, 2023

On December 23, 2023, Mr. Johnson submitted a grievance that was assigned Grievance Number 24-169446. Dkt. 116-5 at 2. In that grievance, Mr. Johnson complained that he had relapsed on opioids, was going through withdrawals, was not being given adequate treatment for his OUD and withdrawal symptoms, and had not received responses to several HCRFs about his MAT program status and his withdrawal symptoms. *Id.*

Putnamville's grievance specialist responded more than a month later—on January 29, 2024—stating that custody staff had never been informed that Mr. Johnson was suffering from withdrawal symptoms. *Id.* at 4. In addition, withdrawal symptoms are a medical emergency that must be communicated to custody staff and not submitted via HCRF. *Id.* Thus, because Mr. Johnson submitted an HCRF rather than communicating to custody staff, his symptoms were "not withdrawal symptoms." *Id.* Mr. Johnson appealed by checking "Disagree" on the response form and submitting a grievance appeal form. *Id.* at 4–5. Warden Pretorius denied the appeal. *Id.* at 9. Mr. Johnson then filed a second-level appeal, which was also denied. *Id.* at 10.

### e. Grievance Number 24-171986, Submitted December 31, 2023

On December 31, 2023, Mr. Johnson also submitted a grievance that was accepted on January 11, 2024, and assigned Grievance Number 24-171986. Dkt. 116-8 at 2. In that grievance, he complained that he had submitted an HCRF requesting treatment for opioid withdrawals but had been sent to an addiction recovery counselor, not a medical provider. *Id.*

Mr. Johnson did not receive a response until late February 2024, when the grievance specialist told him that his HCRF had been previously addressed and that, if he was having withdrawal symptoms, he was required to tell custody staff and not address them by HCRF. *Id.* at 4. Mr. Johnson appealed, and the warden upheld the grievance specialist's response. *Id.* at 7.

Mr. Johnson filed a second-level appeal. *Id.* at 7. On March 7, 2024, the Grievance Department Manager overturned the facility-level response, stating:

> This says that the HCRF was previously addressed. It was not. While withdrawal symptoms should indicate a need for immediate assessment. The II [incarcerated individual] should be able to submit his complaints to medical and be called over to see a nurse. There is a process that would allow for the nurse receiving and reviewing HCRF to call the II over for an initial assessment to rule out any immediate interventions required. This II should have seen nursing staff for an assessment. With concerns of withdrawal, he should not have been routed to ARS [Addiction Recovery Services] staff. I do not see an assessment to rule out withdrawal . . . . Medical staff was made aware that with these types of concerns in the future you need to be assessed prior to a referral to ARS if indicated.

*Id.* at 8.

15

### f.  Grievance Number 24-169447, Accepted January 29, 2024

In the meantime, while Mr. Johnson was waiting for a response to Grievances 24-169446 and 24-171986, on January 4, 2024, he wrote to Warden Pretorius again, complaining that he still had not received a response to his grievances since June 2023. Dkt. 69-1 at 8; dkt. 126-1 at 2. Warden Pretorius responded on January 8, 2024, stating, "It is not a secret that we have had staffing problems and response issues in the grievance department. You can refile as Ms. J. Crabbe started in that position today." Dkt. 69-1 at 8. Mr. Johnson then refiled the grievance he had tried to file in September 2023. *Id.* at 2–3.

On January 29, 2024, he received a grievance receipt indicating that the grievance had been filed and assigned Grievance Number 24-169447. Dkt. 116-6 at 2. Ms. Crabbe, however, rejected the grievance because it was "duplicative of a grievance and out of time frame." *Id.* at 1. Mr. Johnson did not revise the grievance or appeal the rejection. Dkt. 116-1 at 10.

### VI.
### Discussion

The PLRA requires that a prisoner exhaust available administrative remedies before suing over prison conditions. 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted).

"To exhaust administrative remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). A "prisoner must submit inmate complaints and appeals 'in the place, and at the time, the prison's administrative rules require.'" *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

"Because exhaustion is an affirmative defense," Defendants face the burden of establishing that "an administrative remedy was available and that [Mr. Johnson] failed to pursue it." *Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016) (internal quotation omitted). As a result, "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal quotation omitted). An administrative procedure is unavailable when 1) the process operates as a "simple dead end," 2) when it is so opaque that it is incapable of use, or 3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60. If grievance policy language is ambiguous, or if grievance provisions are vague or confusing, any ambiguity is resolved in favor of the prisoner, because the burden of proof rests with the defendants to show an administrative process was available. *Miles v. Anton*, 42 F.4th 777, 781–82

17

(7th Cir. 2022). Similarly, the administrative process can be unavailable if a prison's response to a grievance "so obscure[s] the administrative process" that it becomes "unknowable." *Reid*, 963 F.3d at 331.

### A. Plainfield

Defendants Hale, Jones, and Rothrock were only involved with Mr. Johnson while he was incarcerated at Plainfield. They argue that Mr. Johnson failed to exhaust his claims against them because he did not appeal the denial of Grievance 23-152508. Dkt. 113 at 10. Defendants Centurion Health Services ("Centurion") and the IDOC argue that any claims against it relating to Mr. Johnson's time at Plainfield are barred for the same reason. *Id.*; dkt. 117 at 14.

Mr. Johnson responds that the full grievance process was unavailable to him because Mr. Foster's grievance response was 4 days late and, in any event, Mr. Foster misrepresented to him that an MAT referral would occur, thereby relieving him of any need to pursue more steps of the grievance process. Dkt. 128 at 10–11; dkt. 130 at 10–11. The Medical Defendants and the IDOC reply that Mr. Foster's response was not late and, even if it was, the delay did not prevent Mr. Johnson from pursuing a first-level appeal. Dkt. 134 at 2–3; dkt. 135 at 2–3. They concede that staff misrepresentations about the grievance process may make that process unavailable but argue that rule applies only to misrepresentations that would thwart an inmate from completing the process. Dkt. 134 at 3; dkt. 135 at 3. They also assert that Mr. Foster's alleged misrepresentation did not stop Mr. Johnson from appealing or filing another grievance about the misrepresentation. Dkt. 134 at 3; dkt. 135 at 3.

Questions of material fact exist as to whether the full grievance process was available to Mr. Johnson at Plainfield. Mr. Johnson's designated evidence shows that Mr. Foster offered an acceptable solution to Grievance 23-152508, so Mr. Johnson marked "Agree" on the grievance response. His evidence also demonstrates that, to get an appeal form, he first had to follow an unwritten rule requiring him check "Disagree" on the grievance response form. *See Crouch v. Brown*, 27 F.4th 1315, 1321 (7th Cir. 2022) (administrative-exhaustion rules are not exclusively those reduced to writing). As a result, his designated evidence supports an inference that it was practically impossible for him to file an appeal once it became clear that the promised MAT referral had not happened or, at a minimum, that the grievance process was ambiguous as to whether he could appeal a grievance response that he initially thought was acceptable.

Defendants argue that Mr. Johnson failed to exhaust because he should have filed another grievance about the failure to live up to the promised grievance resolution. Adopting such a rule would allow prison staff to prevent an inmate from ever exhausting by telling him that his complaint would be resolved and then failing to do so, thereby requiring him to file another grievance and starting the whole process again, thereby creating an effective "dead end." *See id.* at 1320, 1322 (prison officials and staff may not take unfair advantage of the exhaustion requirement).

For these reasons, the Medical Defendants' motion for summary judgment is **denied** as to Mr. Johnson's claims against Defendants Hale, Jones, and Rothrock and to his claims against Centurion that are tied to his time at

Plainfield. In addition, the State Defendants' motion for summary judgment is **denied** as to Mr. Johnson's claims that relate to his time at Plainfield.

### B. Putnamville

Defendants argue that Mr. Johnson did not exhaust available administrative remedies as to the claims relating to his time at Putnamville because he did not complete all three steps of the grievance process as to any relevant grievance before he filed his complaint in this case. Dkt. 113 at 10–12; dkt. 117 at 10. As to the June 19 Grievance, the State Defendants contend that the IDOC has no record that it was ever filed, but, even if it were, Mr. Johnson could have and should have submitted an appeal when he failed to receive a response after 20 business days. *Id.* at 7–8. By failing to do so, he didn't exhaust that grievance. *Id.*

Mr. Johnson responds that he could not have appealed the non-acknowledgement of the June 19 Grievance and the grievance he first tried to submit on September 28 because inmates must check "Disagree" on the grievance response form to get an appeal form, making it practically impossible to appeal a grievance that is never logged and responded to. Dkt. 128 at 16–17; dkt. 130 at 16–17. He also argues that his designated evidence shows that staff at Putnamville routinely failed to adhere to the timeframes set forth in the grievance policy, thereby establishing that the grievance process at Putnamville was effectively unavailable. Dkt. 128 at 21–22; dkt. 130 at 21.

Defendants reply by reiterating that Mr. Johnson never fully exhausted any of the grievances discussed above before he filed suit. Dkts. 134, 135. The

State Defendants also emphasize that Mr. Johnson's direct communications to Warden Pretorius fell outside the terms of the grievance process and that he hasn't explained why he waited 45 days to complain to Warden Pretorius about the lack of response to the June 19 Grievance, when he could have just filed an appeal. Dkt. 135 at 5.

It is undisputed that, when Mr. Johnson filed his complaint in this case, he had not completed all steps of the grievance process as to any grievance he filed at Putnamville. However, genuine issues of material fact exist as to whether the grievance process was available to Mr. Johnson before he filed suit or whether it was effectively a "dead end." Defendants dispute that Mr. Johnson ever filed the June 19 Grievance, but the Court must credit his verified statement that he did. Mr. Johnson has also submitted evidence supporting a reasonable inference that he could not get an appeal form if he didn't first check "Disagree" on an appeal response. Like the grievance he filed at Plainfield, Mr. Johnson's evidence regarding this grievance supports an inference that, regardless of what the IDOC's written grievance policy says, Mr. Johnson could not have filed an appeal as to the unacknowledged June 19 Grievance, or at least that the grievance policy is ambiguous as to whether he could have done so. The same rationale applies to the grievance he originally tried to file on September 28.

And, more broadly, Mr. Johnson has designated evidence from which a trier of fact could conclude that the grievance process at Putnamville during the months before he filed his complaint was effectively a dead end for him. For example, he has designated two written documents in which Warden Pretorius

acknowledges that the grievance department was running behind, one of which explicitly states that there were problems with staffing and grievance responses. Combined with the designated evidence showing that Putnamville staff responded to several of Mr. Johnson's grievances well outside the allotted time frames, Warden Pretorius's statements support a reasonable inference that there were significant and systemic delays in the grievance response process at Putnamville at the relevant times.

The State Defendants emphasize that Mr. Johnson eventually got a response to all the grievances that he filed and that he had an opportunity to appeal all those responses. Dkt. 135 at 8. Mr. Johnson, of course, submits that he never received a response to the June 19 Grievance, even though Warden Pretorius told him he would get one. But even if he did eventually receive responses to all his grievances, taken in the light most favorable to Mr. Johnson, the designated evidence shows that Mr. Johnson complained about time-sensitive medical issues. Furthermore, the delays were significant and repeated, which supports a reasonable inference that the grievance process was effectively a dead end for Mr. Johnson during this time period as to the issues raised in this lawsuit.[7] Put another way, there is a question of fact as to whether Mr. Johnson actually had "available" administrative remedies to address his time-

---

[7] Nothing in this Order should be read to constitute a conclusion that the grievance process was generally unavailable to all inmates at Putnamville for a period, or that the grievance process is unavailable every time a prison fails to strictly meet the grievance policy's response deadlines. The Court's decision in this case is limited to the specific facts presented by this case.

sensitive issues, where there was a pattern of his grievances not being timely addressed.

In short, there are material questions of fact as to whether Mr. Johnson exhausted available administrative remedies for the claims related to his time at Putnamville. For these reasons, the Medical Defendants' motion for summary judgment is **denied** as to Mr. Johnson's claims against Defendants Moore, Nicoson, Perez, Pridemore, and Snowden and his claims against Centurion that are tied to his time at Putnamville. In addition, the State Defendants' motion for summary judgment is **denied** as to his claims against Defendants Bumgardner, Fields, Phegley, Pretorius, and Russell and his claims against the IDOC that are tied to his time at Putnamville. Within **14 days of the date of this Order**, each set of Defendants shall file a notice informing the Court whether they wish to withdraw their exhaustion defenses or proceed to a *Pavey* hearing. If they wish to proceed to a *Pavey* hearing as to only some of Mr. Johnson's claims, they shall specify which claims. **Failure to timely file the required notice will be construed as a withdrawal of the exhaustion defenses.**

## VII.
## Summary and Conclusion

In summary, Mr. Johnson's objection to the Magistrate Judge's Order, dkt. [133], is **overruled.** His motion to strike, dkt. [119], is **denied**, and his motion for leave to file a surreply, dkt. [136], is **granted**.

Defendants' summary judgment motions, dkts. [111] and [115], are **denied**.[8] They shall file notices informing the Court whether they wish to withdraw their exhaustion defenses or proceed to a *Pavey* hearing as set forth in Section VI within **14 days of the date of this Order.** Mr. Johnson's motion for status update, dkt. [138], is **granted** to the extent the Court has now ruled on Defendants' summary judgment motions and all related motions.

Mr. Johnson's motion for preliminary injunction, dkt. 140, and related motions for judicial notice and to lift the stay, dkts. 143 and 145, will be addressed by separate order.

**SO ORDERED**.

Date: 2/19/2025

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

JEREMY LEE JOHNSON
114749
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Laura K. Binford
RILEY BENNETT EGLOFF LLP
lbinford@rbelaw.com

---

[8] Several of Mr. Johnson's filings accuse defense counsel of violating Rule 11. *See*, *e.g.*, dkt. 119 at 2. To the extent that he seeks sanctions, such request is **denied** because there is no evidence that he complied with Rule 11(c) before seeking sanctions. Moreover, the Court finds no factual basis to conclude that Defendants' counsel violated Rule 11 by pressing exhaustion defenses.

Beau Browning
Riley Bennett Egloff LLP
bbrowning@rbelaw.com

Abigail Davis
Office of Indiana Attorney General
abigail.davis@atg.in.gov

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov